Case number 23-72112, Bainbridge Fund Ltd. Appellant v. Republic of Argentina. Mr. Costantini for the appellant, Mr. Bucuzzi for the appellate. May it please the court, first of all, good morning to you all. My name is Tony Costantini. I am from the Duane Morris firm and I'm representing Appellant Bainbridge Fund, which has a $95 million judgment against the Republic of Argentina issued in the Southern District of New York. And we've appropriately registered here in the District of Columbia. And we are now seeking to attach a property on Hall Street in order, that belongs to the Republic of Argentina, in order to satisfy part of that judgment. The case concerns one statute, but in two different ways. It's 28 U.S. Code 1610A, and specifically the commercial activity in the United States part of that code. The first question is whether the property was used for commercial activity. And we'll present why we think it was and what we think are flaws in the district court's judgment otherwise. The second question is whether we need to show that at all in light of the Republic of Argentina's consent under Foreign Sovereign Immunities Act to any post-judgment relief. With respect to the first question, I think the facts are pretty clear from the record and they're basically uncontested. The property was once used as a residence for people from Argentina, basically the Defense Department, but that use was 35 years ago. And at current time, it has no diplomatic use unless you count that there are some records stored in the basement. And I think significantly... But no diplomatic use doesn't mean, does it, commercial use? It does not. I am going to get into why we think there is commercial use, but you're right as to that, Your Honor. I just wanted to mention, because I think it's important in the overall analysis, that the State Department removed the property from its diplomatic roles over 20 years ago. Since they stopped using it for diplomatic purpose, they used it for tenants. They rented it out. They have twice tried to sell the property, complete with real estate agents and bids, etc. And they have twice removed the property from sale when someone like us challenged the ownership of the property through an attachment. And in fact, another panel of this Court has said that that should be considered in any analysis because that panel suggested that it may have been manipulative. As I said, it has been removed from the State Department's list of diplomatic. Since then, the District of Columbia has reclassified the property as residential. It has imposed real estate taxes, which the Republic has paid for the last 20 years. And we're talking about hundreds of thousands of dollars without any protest, at least any protest that we know of that's in the record. Congress has distinguished commercial property from other property held by a foreign nation. And you're telling us that private parties should be able to alter the balance that the Congress struck by waiving the protection. I think you're referring to my second argument, which I haven't gotten. So far, I've heard only facts. You've got five and a half minutes. Well, let me finish. First of all, in the decision below, the Court made the presumption that it was our burden to show commercial activity. That's contrary to precedent within this circuit. We have cited the EIG case, the Rodriguez case, but there are literally a number of other cases where the circuit has said the burden is on the sovereign. So the court did not place—the sovereign has to show immunity. So the court below did not require Argentina to do that, and we think that makes a difference. And in the analysis of commercial activity, the court below did not consider the fact that the diplomatic list, the State Department, the District of Columbia had charged real estate taxes classified as residential, and that has been paid. I think all those factors have to be considered under what this court has said is a holistic approach, and I think it's the more recent, not aberrational if they've tried to sell the property twice. The possible manipulation should be considered, as should all the factors that have occurred over the last 20 years with respect to the loss of diplomatic status, the imposition of taxes, and the payment of those taxes. And taking it all together, we added up to commercial activity, and that is the result that we urge on the court if the court applies what it has said is the proper standard on burden or proof in this type of case, and if it considers all the issues that the district court did not consider. If anyone has any questions about this aspect, I can do this now, answer questions now, before I move on to the other aspect, which I think is what Judge Ginsburg was asking about before. I will then move right into the other aspect. What I would like to do is do it, and first of all, turn your general attention to page 129 in the Joint Appendix. That has the relevant, the most important parts of the relevant contract between Argentina and the bondholders. It says that, first of all, that the Republic agrees that a final non-appealable judgment shall be conclusive and binding upon it, and may be enforced basically in any court. I don't think you could be more raw than that in terms of saying that we in this agreement are agreeing that whether or not there is commercial activity, you could enforce it in a retaining court. Now, right after that, it says the Republic has a full extent permitted by the laws. The appellate courts that have dealt with that issue have looked at it very carefully. They said laws of such jurisdiction, that would include the Foreign Sovereign Immunities Act, and the Foreign Sovereign Immunities Act says a commercial activity. Therefore, our view of this clause is that commercial activity is still required. As was said by the Second Circuit, they regard this clause as coextensive with the Sovereign Immunities Act. Not so with respect to the next clause, which is where we draw our attention. The next clause says that the Republic consents generally, for the purposes of the Foreign Sovereign Immunities Act, that any post-judgment relief. In our view, that language is completely and totally inconsistent with the Foreign Sovereign Immunities Act's requirement of commercial activity. How could you have any post-judgment relief if the commercial activity clause stands in the way? I think this is a deliberate choice by the Republic to create, at the very least, a misimpression upon investors. When you go beyond that, there is an exception in small Roman numerals for various assets of the Republic. I think that further shows that the Republic understood that it was surrendering or consenting to this. We have, we think, a clear conflict between the language of the specimen note and the statute. The court below resolved that conflict by simply saying, and he may be right, although I think he's wrong, that no matter how much you broaden the waiver, which I think recognized that the waiver was being broadened, it cannot overcome the Foreign Sovereign Immunities Act. Our answer to that is, why not? This contract interpretation is under New York law, and we've cited some New York Court of Appeals cases, and there are more. It basically says that a party to a contract can give up any statutory or constitutional rights that he or she has, as long as the surrender does not violate public policy. And we don't see any violation of public policy here. And we think in this case, New York law should overcome the commercial activity of the requirement of the Foreign Sovereign Immunities Act, especially when you consider how the language is put together. It clearly, and the Second Circuit has reviewed it. Let me interrupt you. Unless my colleagues have questions, you're out of time, but we'll give you some time in reply. Well, I'm almost done. All right, please sit down. Okay. I'm sorry. Basically, I was just going to cite you to a few Second Circuit cases. Your time is up. Please sit down. Oh, I'm sorry. Now I understand, unless your colleagues have questions, please sit down. Yes. I guess they do not have questions. No. Thank you. And I apologize again, Your Honor. Mr. Boccucci. Thank you, Your Honor, and may it please the Court. Carmine Boccucci from Clerigotli for the Apelli, the Republic of Argentina. The district court's denial of plaintiff's motion for an attachment of the Argentine property at 2136 R Street NW, what we refer to as a chancery annex, was correct and should be affirmed. To start with Appellant's second point, whether the scope of the waiver means that the district court need not even consider the question of whether the property was used for a commercial activity, I wanted to start with the language of the statute. 28 U.S.C. Section 1610 is clear on its face. You start with A, the property in the United States of a foreign state used for a commercial activity in the United States shall not be immune from attachment in aid of execution, if. And then the first if, A1, is the foreign state has waived its immunity from attachment or execution. So, in other words, the universe that we're talking about and that we're limited to by the statute is the universe of property of a foreign state used for a commercial activity in the United States. What the waiver does is give a party that is signed on to a contract with such a waiver the ability to go after such property. Without a waiver, then that party would be confined to an even narrower universe. So, for example, A2, if you have no waiver, then the plaintiff would be limited to property that is or was used for the commercial activity upon which the claim is based. So, in this situation, we're talking about a bond and pretty much if we had no waiver here and his judgment was based on that conduct, we would be talking about the null set. But as it were, the waiver opens up the broader, potentially broader world of property used for a commercial activity. The language of the waiver itself, all the Republic does in the language that he relies on is consents for purposes of the Foreign Sovereign Immunity Act to its waiver. And so, of course, that means if we're consenting for purposes of Foreign Sovereign Immunity Act, there is nothing in this act that authorize the attachment of diplomatic commercial property or property that's not being used for commercial activity. The only area which is potentially broader to something called, again, commercial property is in the context of a foreign state instrumentality, which, of course, the Republic is not. So, everything ties together, the statute, the language in the waiver, and we're stuck just as every other court that's dealt with this. And the Second Circuit has been dealing for years with this exact waiver language and always has to train the analysis on, was the property being used for commercial activity in the United States? And as to that question, I think the District Court got it exactly right. It applied this court's articulation of the relevant standard from the Pig case involving this same property and another plaintiff, they're a plaintiff seeking to enforce a judgment based on an arbitration award. And there, this court said, you look at the totality of the circumstances surrounding the property to determine whether in the court's judgment it's being used for commercial activity. Importantly, you don't artificially narrow the point of examination. And so, here, if we look at it, we're talking about a property that was it was used to house the military representatives to the Inter-American Defense Board. That is a cooperative, multi-state organization that's meant to deal with military challenges facing North and South and Central America. And Argentina was a founding member of that diplomatic organization. And so, we're talking about a building that for 70 years has been there diplomatically and against this, and was on the diplomatic rolls until 2004. And against this, the commercial activity that the plaintiffs point to is the fact that it was listed for sale twice over a period of two years, 20 years, excuse me. And then also there was some leasing activity when this property was on the diplomatic rolls for a short period in the late 80s and a little bit in the 90s. That, I think, the district court got exactly right in weighing all the factors. In all of the recent years, over the past couple of decades, it's not about diplomatic activity. There's been absolutely none. It's listed for sale. Bids have been taken. Negotiations have been had. And there's some garbage stored in the basement, maybe. But it's certainly not a diplomatic unit. And so, the best I can notice about this property is that it's on commercial markets. And bids have been taken. Negotiations have been had. Why not? Again, I can't talk about what happened in the 80s. That's not what this property is about. It's a rundown piece of whatever as described in the record. And it's been put up for sale several times. And bids take most recently. It is not a diplomatic unit. It's not recognized as such. They pay taxes on it. There's evidence in the record that the diplomatic commission considers it part of the diplomatic mission. It's under the aegis of the Ministry of Foreign Affairs of Argentina. Only people from that ministry have access to the building. There are some diplomatic files there. But importantly, the test— They own the commercial property. That's true. So, they're the only ones who have the keys. I don't know what that proves. But I think the important— If it were diplomatic property, that's not being used that way anymore. But I think the toggle, Your Honor, is not— If it's not diplomatic, then it's, quote, commercial. I totally agree with that. One doesn't prove the other. I absolutely agree. And so, the question is— I'm looking at how it is being used. And the only uses I see, apart from some garbage stored in the basement, is that bids are up and negotiations with brokers are ongoing. And that's what we see happening with this property. But, again, if we look at it— So, it was listed once in 2004. That yielded no bids, and it lapsed. And so, nothing happened. There was actually no— And so, they listed it again. And then, 14 years later, it was listed again. There was no accepted offer. And so, if we're just training— If we look at that and those two instances— There's still a continuous interest in trying to get rid of this property. I'm not— There's no— And Judge Bates found this, and I think it was not clearly erroneous. There is no showing, and plaintiffs concede, that it was not a continuous interest in selling the property or continued attempts to sell the property. In fact, you had these two instances. Don't forget, Argentina has been going through, at the beginning of this time period, the worst financial collapse in its history, in its modern history. And then, later on, it had problems throughout. So, it didn't have the money to fix the building, which is another possibility. The building could be restored by them and put back into diplomatic use. And so, at two points, there was a consideration for a sale that never turned into anything. And I think, here, the totality of the factors test, if it means something, it doesn't mean you just look at those two moments of time, because there is no evidence that, in between that, there were any interests or intent or plans to sell or use of this property in the market at all. So, if you look at those two moments of time against this backdrop, and again, the fact that this is, you know, it wasn't the Argentine steakhouse. It was a diplomatic residence for all these decades. And so, it's not something that's been moving in and out of commercial use. You have these two attempts. They didn't go anywhere. And then, you have a property that's not being used for anything. And use for a commercial activity has been held consistently across the circuits to be a real requirement. It's not just property that's sitting around, property that's not being used. It has to be property that's used in the totality of the circumstances for commercial use. So, for example, the Fifth Circuit case, the AFCAP case involving the Congo, there, they looked at royalty payments the Congo was receiving over a period of 24 years. And the court, the Fifth Circuit, in that case, reversing the lower court, said, well, for 11 of those 24 years, you, the Congo, were using that money in the old-fashioned sense, commercial sense, to settle claims against the Congo, commercial obligations of the Congo. Therefore, given 11 years of actual economic commercial activity over a 24-year period, we think use for a commercial activity is satisfied. You don't have any of that here in terms of a lengthy, continuous use of this property. It just hasn't been used. It's fallen into disuse. And then you have these two moments in time where it was listed and there was no actual sale that happened. I also think it's important to think about the sort of policy ramifications of what my adversary is saying. This town is obviously filled with embassies, diplomatic properties, and the rest. That's what they generally exist to be. And if we're going to say at the moment any of those are being sold, say, by a debtor nation, that a creditor can swoop in and disrupt that sale, particularly if the sale involves another sovereign, et cetera, I think that is not what is contemplated by the FSAA in its very strict requirement that something actually be used for a commercial activity, and then also 1602's reference to actual commercial property. So I'm not sure I have further questions. All right. Thank you. Thank you. Why don't you take one minute? Thank you, Your Honor. I'll be very, very brief. My adversary said that every court that has considered this issue has sustained the continued commercial activity use. Every court that has considered this issue has considered the waiver clause. And the way they have considered the waiver clause is whether the waiver clause is inconsistent with the Foreign Sovereign Immunities Act, and it decided that it was not. This is different. This is the consent clause, which is inconsistent, and which no court has ever considered the implications of. And that's the only thing I wanted to point out in rebuttal. All right. Thank you. Thank you very much, Your Honor.
judges: Henderson, Edwards, Ginsburg